UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| LEASE AMERICA.ORG, INC., <br><br>                    Plaintiff, <br>          vs. <br><br> ROWE INTERNATIONAL CORPORATION; AMI ENTERTAINMENT NETWORK, INC.; AMUSEMENT AND MUSIC OPERATORS ASSOCIATION, INC.; DOE DEFENDANTS 1–10, <br><br>                    Defendants. | CASE NO. 4:13-cv-40015-TSH <br><br> FIRST AMENDED COMPLAINT FOR DAMAGES FOR VIOLATIONS OF: <br><br> (1)  SECTION ONE OF THE SHERMAN ACT; <br><br> (2)  UNFAIR BUSINESS PRACTICES UNDER MASSACHUSETTS GENERAL LAW CHAPTER 93A <br><br> HON. TIMOTHY S. HILLMAN <br> [DEMAND FOR JURY TRIAL] |

Plaintiff Lease America.org, Inc. ("Lease America") files this First Amended Complaint against Defendants Rowe International Corporation ("Rowe"); AMI Entertainment Network, Inc. ("AMI"); and Amusement and Music Operators Association, Inc. ("AMOA") to secure damages, and demanding trial by jury, claims and alleges as follows:

## INTRODUCTION

1. This is a paradigm case involving a restraint of trade in an industry that is in a constant struggle to maintain the status quo. Lease America offered to sell digital jukeboxes in a manner that was more favorable to consumers than the traditional method. Its business model was a direct threat to the conventional distribution channels that have been standard in the industry for decades. Lease America's competitors are openly hostile to Lease America's method of doing business, and Defendants AMOA and Rowe worked together in concert to prevent progressive change in the jukebox operator industry. This suppression would ensure that the traditional model could remain unrivaled and no one would have to innovate to compete or survive.

2.      The AMOA, backed by the power of strength in numbers, threatened a boycott against Rowe if Rowe continued to supply jukeboxes to Lease America.  Unwilling to risk losing a substantial portion of its customer base and further angering a powerful trade association, Rowe acquiesced to the AMOA and remotely disabled all of Lease America's jukeboxes without any prior notice, providing only vague and pretextual reasons for doing so.

3.      Lease America brings this action seeking redress for violations of Section 1 of the Sherman Act, and violations of Section 11 of Chapter 93A of the Massachusetts General Laws.

## JURISDICTION AND VENUE

4.      This Court has original and exclusive jurisdiction over this civil action pursuant to 15 U.S.C. §§ 15 and 1121 and 28 U.S.C. §§ 1331, 1332, and 1337.  This Court may exercise supplemental jurisdiction over the state law claims pursuant to 28 U.S.C. § 1367.

5.      Venue is proper in this District because Defendants all transact business and can be found within this District within the meaning of 15 U.S.C. §§ 15 and 22 and 28 U.S.C. § 1391.  Further, some of the unlawful acts alleged herein were performed and occurred in material part within this District.

## INTERSTATE COMMERCE

6.      The actions complained of herein have restrained and adversely affected interstate commerce because Defendants sell their products and operate across state lines.  Further, Defendants all purchase goods and supplies integral to the conduct of their business in interstate commerce.

## THE PARTIES

7.      Plaintiff Lease America is a corporation existing under the laws of Massachusetts, with its principal place of business at 129 Hartford Turnpike, Shrewsbury, Massachusetts 01545.

8. Defendant Rowe, on information and belief, is a corporation existing under the laws of Delaware, with its principal place of business at 1500 Union Ave., S.E., Grand Rapids, Michigan, 49507.

9. Defendant AMI, on information and belief, is a corporation existing under the laws of Delaware, with its principal place of business at 155 Rittenhouse Circle, Bristol, Pennsylvania 19007.

10. Defendant AMOA, on information and belief, is a corporation existing under the laws of Illinois, with its principal place of business at 600 Spring Hill Ring Road, Suite 111, W. Dundee, IL 60118.

## ADDITIONAL UNNAMED CO-CONSPIRATORS

11. Various persons, firms, corporations, organizations, and other business entities, some unknown and others known, have participated as co-conspirators with the above-named entities in the violations alleged and have performed acts in furtherance of the conspiracy and restraint of trade. Co-conspirators whose identities are presently known include: Rowe and AMOA. Additional co-conspirators may be revealed during the course of discovery.

## FACTUAL ALLEGATIONS

**The Jukebox Market**

12. The jukebox industry has changed in recent years. The majority of new jukeboxes sold in the United States are now digital internet jukeboxes and do not play music based on records or CDs loaded into the jukebox. Rather, these new jukeboxes are self-contained and consist of a touchscreen display, a core computer, a storage device, a bill validator, and an amplifier. The jukebox requires an internet connection and proprietary software (unique to each box's manufacturer) containing key codes that grant access to the

jukebox's music selection. In other words, a jukebox can only play the manufacturer's music, accessed remotely through the internet from a central server, and nothing else. Digital internet jukeboxes allow the manufacturer to constantly monitor and control every single jukebox it manufactures.

13.   The jukebox industry has a particular and traditional structure where each jukebox ultimately finds a home in a bar, restaurant, or other venue. The largest and sole remaining significant manufacturers of jukeboxes in the United States are Rowe and Touch Tunes. Another large manufacturer, Ecast Network, recently shut down operations. Rowe holds itself out to be the "number one manufacturer" of jukeboxes and has announced that it is a secured creditor of Ecast, so it will presumably become even larger. In a 2009 press release, Rowe, which has approximately 230,000 jukeboxes in operation, acknowledges having 70% of the U.S. jukebox market.

14.   Manufacturers then sell jukeboxes to distributors. Distributors act as a "middle man" between the manufacturers and the operators.

15.   Operators are the jukebox owners, who place jukeboxes in venues for a revenue share and end-user access. A business that wants to become an operator needs permission from a distributor. Once an operator has permission, it signs a master operator agreement and it may then put jukeboxes in restaurants and other venues. Under the traditional model, the venue does not own the jukebox, but it pays a fee to the operator. Some, or all, of this fee moves back upstream to the manufacturer, who then provides a portion to the distributor. The operator remains the technical owner of the jukebox.

16.   Many jukebox operators are members of the AMOA. The AMOA represents the interests of coin machine operators, including jukeboxes. As phrased in a late 2009 to early 2010

email to its members: the AMOA claims: "To be clear, as the trade group representing the interests of coin machine operators, AMOA condemns any practice that attempts to undermine, threaten or otherwise circumvent the operator community."

**Lease America's Business Method**

17.     Lease America's business method is not new, and it is likely not the first and only victim of an anticompetitive competitive concerted refusal to deal.  Lease America challenged the traditional operator business model.  Rather than merely placing jukeboxes in venues and constantly collecting high fees, Lease America would sell the jukebox directly to the venue.  Under Lease America's business model, Lease America would retain no less than a five percent interest in the jukebox, and would collect a monthly fee to cover its ownership interest and other royalty fees.  Selling directly to the venue would grant the jukebox owner greater control over the jukebox and reduce fees paid by venues and end users.  For example, a venue that owned a jukebox could dictate the price a patron paid per song.  Likewise, the venue owner would pay a one-time cost for the jukebox and then would only have to pay Lease America commensurate with the performance of the jukebox.

18.     Lease America had an agreement with Rowe to implement its business model, and demand for Lease America's model quickly increased.  In an email dated July 14, 2008, Mike Maas, an executive with AMI, explicitly agreed to exempt Lease America from certain "click wrap" requirements.  Hoping to avoid angering the operators and distributors that were vociferously opposed to Lease America's business model (and any support Rowe might provide to Lease America), Mike Maas indicated that "[n]either of us will discuss or disclose this special arrangement with other parties.  If you agree to that I think we can move forward immediately."

5

**Defendants' Boycott of Lease America**

19.     Although Lease America's business model was popular with customers, it is no secret in the industry that the AMOA opposed the direct selling of jukeboxes. Jack Kelleher, the AMOA's Executive Vice President, wrote in the AMOA's weekly newsletter on January 7, 2011, *Off the Top*: "Some three years ago, JukesDirect brazenly marketed digital jukeboxes directly to locations and made nary a dent in the industry. It's just not a model that long-term, holds much promise . . . at least domestically. To be clear, as the trade group representing the interests of coin machine operators, AMOA condemns any practice that attempts to undermine, threaten or otherwise circumvent the operator community." As recently as July 2012, the President of the AMOA, Andy Shaffer, stated that he did not "condone" the direct sell model, he did not "believe in it," and the AMOA as an organization did not agree with the direct sell model.

20.     Like JukesDirect (and others), Lease America "brazenly" chose to offer consumers an alternative that might "undermine, threaten, or otherwise circumvent the operator community." Rather than allowing natural market forces to determine whether Lease America's direct model held long-term domestic promise, the AMOA took matters into its own hands.

21.     At a trade show in Las Vegas, Nevada (the precise date which is unknown but prior to 2009), after Lease America announced its business model, an operator opposed to Lease America's business model stated to Lease America founder and CEO Charles Pietrewicz that "the hole is already dug for you." Other operators—that is, Lease America's competitors— complained to Lease America, the AMOA, other trade associations, and Rowe. After several operators had complained to the AMOA about Lease America, the AMOA recognized that it needed to act. In early 2009, the AMOA held a meeting about Lease America and how to

6

suppress its growth. At this meeting, the AMOA's members decided that they would boycott Rowe if it continued allowing Lease America to sell direct. A participant at this meeting later told Mr. Pietrewicz about the occurrence of this meeting, that Lease America was specifically discussed, and the plan that was hatched.

22. After this meeting, in late February to early March 2009, the AMOA approached Rowe and threatened that its operator members would no longer use Rowe jukeboxes if Rowe continued to allow Lease America to sell its jukeboxes direct. Unwilling to lose an enormous share of its customer base, Rowe agreed with the AMOA and its members to boycott Lease America, and on March 10, 2009, Rowe terminated Lease America's agreement with no advance notice. After already granting Lease America an exemption from the new "click wrap" agreement, AMI's counsel indicated that Lease America had deviated from those terms. Neither AMI nor Rowe provided any specification to Lease America.

23. Because the jukeboxes were controlled from a Rowe central server, the jukeboxes were simply turned off, and neither Lease America nor the venue's owners were able to access the content of the jukeboxes, rendering them useless. As such, the venues' patrons were unable to use the jukeboxes as well. Lease America could not practicably turn to the only other significant jukebox manufacturer Touch Tunes as a substitute or alternative to Rowe because (1) no other jukebox manufacturer could make Lease America's Rowe hardware (digital jukeboxes) work with their respective platforms and (2) no other manufacturer, including Touch Tunes, would, after the boycott threat, deal with Lease America.

24. The AMOA has faced criticism for not being aggressive enough to suppress direct-sale operators. One article from *Vending Times*, posted on February 25, 2011, stated: "These critics ask . . . Where is AMOA now that another direct-sales jukebox scheme has

popped up?"  As such, the AMOA's induced boycott of Lease America was timed with an AMOA industry trade show.  At this trade show, it was announced that the AMOA had successfully caused the termination of Lease America—a "direct-sales jukebox scheme."  After shutting Lease America's jukeboxes off, Rowe sent out operators to Lease America's customers to convert the Lease America jukeboxes to new agreements.  These operators informed Lease America's customers that Lease America had been shut down.

25. Lease America is not the only operator that has been the victim of a boycott. When Ecast (Rowe's former competitor) supported a direct sell program, AMOA New York director Danny Frank sent a scathing letter to the president of Ecast.  This letter broadly hinted that operators would boycott Ecast if it continued to support Power House, a California jukebox operator that had a business model similar to Lease America's.  Likewise, the AMOA stated that "attempts have been made to ratchet up the pressure on the manufacturer [and] content provider [that] is supplying the music to 'cut off' this particular customer."  While Ecast did not succumb to the AMOA pressure (citing a decree it entered into with the U.S. Department of Justice following an investigation into possible antitrust violations), Rowe did.

26. Rowe's disabling of Lease America's jukeboxes was the killing blow to Lease America's direct sell business model.  The AMOA, acting as a combination of its members, responded to its members' complaints by bullying Rowe—through threats of boycotting Rowe— to eliminate Lease America as a competitor.  The AMOA's threat against Rowe was successful; Lease America was forced out of the market, and consumers were deprived of an alternative choice to the status quo for acquiring or purchasing jukeboxes.

## CLAIMS FOR RELIEF

## CLAIM ONE

## Violation of the Sherman Act, Section 1 (15 U.S.C. § 1)

## (Against all Defendants)

27.    Lease America re-alleges and incorporates by reference the allegations set forth in paragraphs 1–26 of this Complaint.

28.    Section 1 of the Sherman Act (15 U.S.C. § 1) prohibits agreements or arrangements that unreasonably restrain competition to the detriment of consumers.

29.    The AMOA—acting as a combination of its operator members—was opposed to Lease America's method of selling jukeboxes.  On or around late February to early March 2009, the AMOA approached Rowe, Lease America's jukebox manufacturer, and indicated that its operator members intended to stop purchasing jukeboxes from Rowe if it continued to supply Lease America.  On March 10, 2009, agreeing with the AMOA, Rowe simply turned off all of Lease America's jukeboxes.  When Lease America could no longer offer music for the jukeboxes it sold, its other operator competitors took over Lease America's customers.

30.    This direct agreement between the AMOA and Rowe is a brazenly anticompetitive arrangement that impacts consumers' ability to obtain digital jukeboxes under more favorable terms.  The AMOA acted as a combination of its members to incite this boycott, which Rowe acquiesced to.  Given the largely horizontal nature of this boycott and that it is not ancillary to any legitimate business arrangement, the restraint of trade at issue is per se unlawful.

31.    Alternatively, the AMOA and Rowe's agreement to boycott Lease America is an unreasonable restraint of trade that violates the "Rule of Reason."  The anticompetitive consequences of the boycott, as set forth below, substantially outweigh any procompetitive

9

effects that may stem from the conduct.

33. The relevant product market for antitrust purposes is digital jukeboxes. There are no reasonably interchangeable substitutes for digital jukeboxes in terms of price, use, and quality. The relevant geographic market is the United States because that is where purchasers of digital jukeboxes purchase these products and that is where the sellers sell them.

33. The above-described acts of the AMOA, Rowe, and other unnamed co-conspirators have produced antitrust injury, as more specifically described in paragraphs 1, 13, 17, 23, and 26, and will continue to produce at least the following anticompetitive and injurious effects upon competition in interstate commerce in the United States:

(a) When Rowe/AMI, acting pursuant to the trade-restraining conspiracy with the AMOA, turned off Lease America's jukeboxes as explained in paragraph 29, this had the effect of depriving venue owners and venue patrons of utilizing Lease America jukeboxes with the result that output of jukeboxes in the relevant geographic market was reduced and competition in the relevant product market was reduced, particularly price competition because Defendants were relieved of the competitive pressure created by Lease America's direct selling business model. Accordingly, price competition in the market for digital jukeboxes has been substantially and unreasonably restricted, lessened, foreclosed, and eliminated, with the effect that consumers are being charged and will continue to be charged higher prices for jukebox utilization.

(b) When Rowe/AMI, acting pursuant to the trade-restraining conspiracy with the AMOA, turned off Lease America's jukeboxes as explained in paragraph 29, this had the effect of depriving venue owners and venue patrons of utilizing Lease America jukeboxes, with the result that total output has been reduced, and consumer choice has been, and will continue to

be, limited and constrained as to the manner in which they may acquire digital jukeboxes.

(c) When Rowe/AMI, acting pursuant to the trade-restraining conspiracy with the AMOA, turned off Lease America's jukeboxes as explained in paragraph 29, this had the effect of depriving venue owners and venue patrons of utilizing Lease America jukeboxes, with the result that output has been reduced and consumer access to Lease America (and other) direct-sale jukeboxes has been artificially restricted and reduced.

(d) When Rowe/AMI, acting pursuant to the trade-restraining conspiracy with the AMOA, turned off Lease America's jukeboxes as explained in paragraph 29, this had the effect of insulating Defendants from the competitive process, innovation, and pressures of competition, with the result that consumers will continue to pay higher prices for digital jukeboxes, with less control over the entertainment in their own venues.  One observable effect of the Defendants' conduct on innovation is that Lease America's more efficient and less expensive direct method of distributing jukeboxes has been suppressed and thwarted and is not likely to be resurrected in the foreseeable future.

(e) When Rowe/AMI, acting pursuant to the trade-restraining conspiracy with the AMOA, turned off Lease America's jukeboxes as explained in paragraph 29, this had the effect of relieving Defendants of the competitive pressure of responding to innovations, with the result that innovation in the way digital jukeboxes can be obtained and operated by consumers has been, and will continue to be, suppressed, limiting output and causing harm to Lease America, competitors, consumers, and the competitive process.  Since Defendants' boycott was implemented, Lease America has received thousands of inquiries from interested consumers across the country to buy jukeboxes directly from Lease America.  But because of Defendants' unlawful restraint of trade, consumers were unable to purchase jukeboxes from Lease America

and were required to stick with the outdated and inefficient status quo.

34. By reason of, and as a direct and proximate result of, Defendants' anticompetitive practices and conduct, Lease America has suffered financial injury to its business and property in that Lease America has been deprived of revenues and profits it would have otherwise made. As a result, Lease America was driven out of business, and has sustained, in addition to a loss of profits, a loss of going concern value. Preliminary calculations reflect that in the period from March 1, 2009 through December 31, 2012, Lease America would have sold 1000 jukeboxes, producing net lost profits of slightly more than $5,000,000. Based on those projected lost earnings, Lease America's preliminary calculation of loss of going concern value is approximately $10,000,000.

## CLAIM TWO

### Violation of Chapter 93A of the Massachusetts General Law

### (Against all Defendants)

35. Lease America re-alleges and incorporates by reference the allegations set forth in paragraphs 1–34 of this Complaint.

36. Defendants are engaged in the conduct of trade and commerce in the Commonwealth of Massachusetts within the meaning of Massachusetts General Law Chapter 93A ("chapter 93A").

37. Based on all of the above alleged conduct, and other conduct to potentially be revealed during discovery, Defendants violated chapter 93A by engaging in unfair methods of competition and unfair deceptive acts or practices in the jukebox industry within the definition of chapter 93A sections 2 and 11. These practices are:

    (a) violations of statutory laws, the common law, or other established

concepts of unfairness;

      (b)    immoral, unethical, oppressive, or unscrupulous; and

      (c)    substantially injurious to competitors, other business people, or both.

38.    The acts described herein occurred primarily and substantially within the Commonwealth because Defendants committed injurious acts within the Commonwealth, Lease America is located in the Commonwealth, and Lease America was injured in the Commonwealth.  Lease America developed its business plan in Massachusetts, is incorporated in Massachusetts, dealt with its jukebox distributor in Massachusetts (Betson New England—located in Massachusetts), paid taxes in Massachusetts, and was put out of business in Massachusetts.  Likewise, when Rowe turned off Lease America's jukeboxes at the AMOA's urging, many of these jukeboxes were located in Massachusetts.  In sum, Lease America is located in Massachusetts and claims significant injury in Massachusetts.

39.    By reason of, and as a direct and proximate result of, Defendants' unfair trade practices in the jukebox industry, Lease America has suffered monetary damages and loss of going concern value.  Because Defendants' conduct was willful and malicious, Lease America is entitled to treble damages and attorneys' fees.

## PRAYER FOR RELIEF

WHEREFORE, Lease America, Inc. prays for relief against Defendants, and each of them, that the Court find that:

(a)    Defendants violated Section 1 of the Sherman Act by engaging in conduct including, but not limited to, a concerted refusal to deal with Lease America in the digital jukebox industry.

(b)    As a direct and proximate result of this concerted refusal to deal, Lease America

has suffered actual damages and loss of going concern value, that are trebled in accordance with Section 4 of the Clayton Act (15 U.S.C. § 15).

(c) Pursuant to Section 4 of the Clayton Act (15 U.S.C. § 15), Lease America be awarded its reasonable attorneys' fees and costs of litigation.

(d) Defendants violated Massachusetts General Law Chapter 93A, Section 11 by engaging in conduct including, but not limited to, the conduct alleged above.

(e) As a direct and proximate result of Defendants' unfair trade practices, Lease America has suffered damages and loss of going concern value, that are doubled or trebled in accordance with Massachusetts General Law Chapter 93A, Section 11.

(f) Pursuant to Massachusetts General Law Chapter 93A, Section 11, Lease America be awarded its reasonable attorneys' fees and costs of litigation.

(g) Lease America should be awarded any and all fair and equitable damages as the Court deems fit.

## DEMAND FOR JURY TRIAL

Lease America hereby demands trial by jury pursuant to Rule 38(b) of the Federal Rules of Civil Procedure.

Dated:  April 3, 2014                                              LEASE AMERICA.ORG, INC.

By its attorneys,

/s/ Eric B. Goldberg                                            /s/ Maxwell M. Blecher
Eric B. Goldberg, BBO# 564398                      Maxwell M. Blecher (*pro hac vice*)
Wilchins Cosentino Friend LLP                       Courtney A. Palko (*pro hac vice*)
20 William Street, Suite 130                            Jordan L. Ludwig (*pro hac vice*)
Wellesley, MA 02481                                       Blecher Collins Pepperman & Joye, P.C.
P: 781.235.5500 / F: 781.235.5577                515 S. Figueroa Street, Suite 1750
egoldberg@wcfllp.com                                    Los Angeles, CA 90071
                                                                         P: 213.622.4222 / F: 213.622.1656
                                                                         mblecher@blechercollins.com
                                                                         cpalko@blechercollins.com
                                                                         jludwig@blechercollins.com

59003.4

## **CERTIFICATE OF SERVICE**

    I, Maxwell M. Blecher, hereby certify that pursuant to Local Rule 5.4(C), a copy of the foregoing First Amended Complaint For Damages For Violations of: (1) Section One of the Sherman Act; (2) Unfair Business Practices Under Massachusetts General Law Chapter 93A [Demand For Jury Trial] was served electronically on all counsel of record via the Court's ECF system on April 3, 2014.

                                                  /s/ Maxwell M. Blecher
                                                  Maxwell M. Blecher