UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

LEASE AMERICA.ORG, INC.,

       Plaintiff,                                             Case No. 1:15-cv-348

v.                                                                          HON. JANET T. NEFF

ROWE INTERNATIONAL
CORPORATION et al.,

       Defendant.
_____/

**OPINION**

      Plaintiff Lease America.org, Inc. ("Plaintiff" or "Lease America") filed this antitrust action against Defendants Rowe International Corporation ("Rowe"), AMI Entertainment Network, Inc. ("AMI"), and Amusement and Music Operators Association, Inc. ("AMOA") alleging restraint-of-trade violations in the jukebox industry.[1] This matter is before the Court on Defendants' Joint Motion to Dismiss (Dkt 118). Plaintiff has filed a Response in opposition (Dkt 120), and Defendants have filed a Reply (Dkt 121). Having fully considered the parties' submissions, the Court concludes that oral argument is unnecessary to resolve the pending motion. *See* W.D. Mich. LCivR 7.2(d). For the reasons that follow, the Court denies Defendants' Motion.

**I. Background**

      Plaintiff and Defendants are all involved in the digital internet jukebox industry in various parts of the United States. Plaintiff Lease America is a Massachusetts corporation incorporated in

---

[1]This case was initially filed in the District of Massachusetts and was transferred to this district on Defendants' motion.

2007, which sells electronic jukeboxes (Dkt 52, First Amended Complaint (FAC) ¶ 7). Defendants Rowe and AMI are jukebox manufacturers.[2] Rowe was based in Grand Rapids, Michigan (*id.* ¶ 8), but no longer exists as an entity. AMI is a Delaware corporation with its principal place of business in Pennsylvania. Defendant AMOA is a not-for-profit trade association based in Illinois, which represents the interests of coin machine operators, including jukebox operators (*id.* ¶ 10). Many jukebox operators are members of AMOA (*id.* ¶ 16).

The Jukebox Market

The majority of new jukeboxes now sold in the United States are digital internet jukeboxes, which are self-contained and consist of a touchscreen display, a core computer, a storage device, a bill validator, and an amplifier. These "electronic" jukeboxes require an internet connection and proprietary software (unique to each box's manufacturer) containing key codes that grant access to the jukebox's music selection. A jukebox can only play the manufacturer's music, accessed remotely through the internet from a central server. Digital internet jukeboxes allow the manufacturer to monitor and control each jukebox it manufactures. (FAC ¶ 12).

The commercial electronic jukebox market operates under a traditional structure of four "levels" of entities: manufacturers, distributors, operators, and venue owners (FAC ¶¶ 13-15). Manufacturers sell jukeboxes to distributors, who essentially act as "middlemen" and in turn sell the jukeboxes to operators (*id.* ¶ 14). Operators are the jukebox owners, who place jukeboxes in venues for a revenue share and end-user access. A business that wants to become an operator needs permission from a distributor. Once an operator has permission, it signs a master operator

---

[2]According to Defendants, Rowe merged with Merit Industries, Inc. in 2009; AMI is the successor to Rowe (Defs' Br., Dkt 119 at PageID.882 n.1, 909). Defendants refer to AMI and Rowe, collectively, as AMI, as will the Court herein.

agreement and it may then place jukeboxes in restaurants and other venues. Thus, under the traditional model, the venue does not own the jukebox, but it pays a fee to the operator. Some, or all, of this fee moves back upstream to the manufacturer, who then provides a portion to the distributor. The operator remains the technical owner of the jukebox. (*Id.* ¶ 15).

Lease America operated under a non-traditional business model, selling the jukebox directly to the venue and retaining not less than a five percent ownership interest. Lease America would collect a monthly fee to cover its ownership interest and other royalty fees. This method granted the jukebox owner greater control over the jukebox and reduced the fees paid by venues and end users. For example, a venue that owned a jukebox could dictate the price a patron paid per song. Likewise, the venue owner would pay a one-time cost for the jukebox and then would only have to pay Lease America commensurate with the performance of the jukebox. (FAC ¶ 17).

Lease America had an agreement with Rowe to implement this non-traditional business model, which exempted Lease America from certain "click wrap"[3] requirements. However, the parties agreed not to disclose the arrangement to other parties. (FAC ¶ 18).

Termination of Lease America's Agreement and Alleged Boycott

At a trade show in Las Vegas, Nevada, sometime before 2009, after Lease America announced its business model, an operator opposed to Lease America's business model stated to Lease America founder and CEO Charles Pietrewicz that "the hole is already dug for you" (FAC ¶ 21). Other operators—that is, Lease America's competitors—complained to Lease America, the AMOA, other trade associations, and Rowe. After several operators complained to the AMOA

---

[3] "A 'clickwrap' agreement is typically used in connection with the installation or operation of software on a machine" (Defs' Br., Dkt 119 at PageID.884 n.6).

about Lease America, the AMOA in early 2009, held a meeting at which the AMOA's members decided that they would boycott Rowe if it continued allowing Lease America to sell direct. A meeting participant told Pietrewicz about the meeting, that Lease America was specifically discussed, and about the plan that was "hatched." (*Id.*).

In late February to early March 2009, the AMOA approached Rowe and threatened that its operator members would no longer use Rowe jukeboxes if Rowe continued to allow Lease America to sell its jukeboxes direct. On March 10, 2009, Rowe terminated Lease America's agreement with no advance notice. After already granting Lease America an exemption from the new "click wrap" agreement, AMI's counsel indicated that Lease America had deviated from those terms. (FAC ¶ 22).

After Rowe terminated Lease America's agreement, neither Lease America nor the venues were able to access the content of the jukeboxes since they were controlled from a Rowe central server. Likewise, the jukeboxes could not be used by the venues' patrons. As a result of Rowe's termination of its agreement, Lease America was forced out of the jukebox market. (FAC ¶¶ 23-26).

Lease America instituted this action in January 2013 in the District of Massachusetts; that court granted the AMI Defendants' motion to transfer venue, and the case was transferred to this court in April 2015. Plaintiff's First Amended Complaint (FAC) alleges two claims: (1) Violation of the Sherman Act, Section 1 (15 U.S.C. § 1); and (2) Violation of Chapter 93A of the Massachusetts General Law. Plaintiff withdrew Claim Two of the FAC (Dkt 108); only the Sherman Act claim remains.

## II. Legal Standards

Defendants move to dismiss Plaintiffs' Complaint under Federal Rule of Civil Procedure

Rule 12(b)(6). Rule 12(b)(6) authorizes the court to dismiss a complaint if it "fail[s] to state a claim upon which relief can be granted." In deciding a motion to dismiss for failure to state a claim, the court must construe the complaint in the light most favorable to the plaintiff and accept all well-pleaded factual allegations in the complaint as true. *Thompson v. Bank of Am., N.A.*, 773 F.3d 741, 750 (6th Cir. 2014). However, a court "need not ... accept as true legal conclusions or unwarranted factual inferences." *Kottmyer v. Maas*, 436 F.3d 684, 688 (6th Cir. 2006). The complaint must present "enough facts to state a claim to relief that is plausible on its face." *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007).

In deciding a Rule 12(b)(6) motion, the court may consider documents referred to in the pleadings that are integral to the claims, as well as matters of public record, without converting a motion to dismiss into one for summary judgment. *Commercial Money Ctr., Inc. v. Ill. Union Ins. Co.*, 508 F.3d 327, 336 (6th Cir. 2007); *Greenberg v. Life Ins. Co. of Va.*, 177 F.3d 507, 514 (6th Cir. 1999). Defendants assert that in deciding the motion to dismiss, this Court should consider various documents presented with its motion, including agreements at issue, emails and other correspondence, and a news release. Plaintiff does not contest the documents relied on by Defendants. It is clear that certain documents, such as the agreements at issue, are properly considered in conjunction with the motion to dismiss. However, the Court questions the propriety of considering various other documents Defendants present, such as the Maas declaration, emails and other correspondence. *See Greenberg*, 177 F.3d at 514. The Court makes no determination in this regard, and the Court's resolution of the motion does not rely on those documents.

### III. Analysis

"Section 1 of the Sherman Act provides that 'Every contract, combination in the form of trust

5

or otherwise, or conspiracy, in restraint of trade or commerce among the several States, or with foreign nations, is declared to be illegal ….." *In re Cardizem CD Antitrust Litig.*, 332 F.3d 896, 906 (6th Cir. 2003) (quoting 15 U.S.C. § 1) (footnote omitted).  While § 1 read literally prohibits *every* agreement in restraint of trade, the Supreme Court has long recognized that Congress intended to prohibit only "unreasonable" restraints.  *Id.*

"Unfortunately, there is no general agreement on the exact standards to use when resolving antitrust cases."  *In re Se. Milk Antitrust Litig.*, 739 F.3d 262, 270 (6th Cir. 2014).  As the Sixth Circuit has acknowledged: "As much as we might wish that a precise process with clear elements existed, antitrust cases in this circuit, and in others, apply various approaches to adjudicating antitrust claims."  *Id.*  There are nonetheless some areas of consensus with respect to the requisites necessary to proceed on an antitrust claim.  *Id.*  Such requirements are at issue here.

Defendants move for dismissal of Lease America's Sherman Act claim on the grounds that (1) Plaintiff has failed to adequately allege "antitrust injury" or "antitrust standing" under the Sixth Circuit's requirements; and (2) Plaintiff has failed to adequately allege an antitrust claim under either the "*per se* rule" or the "rule of reason."  The Court proceeds with the issues as presented and concludes that neither basis warrants dismissal at this stage of the case proceedings.

### A.  Antitrust Injury and Standing

"A private antitrust plaintiff, in addition to having to show injury-in-fact and proximate cause, must allege, and eventually prove, 'antitrust injury.'" *In re Cardizem CD Antitrust Litig.*, 332 F.3d at 909 (citing *Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*, 429 U.S. 477, 489 (1977)).  "'Antitrust injury' is (1) 'injury of the type the antitrust laws were intended to prevent' and (2)

6

injury 'that flows from that which makes defendants' acts unlawful.'" *Id.*; *see also In re Se. Milk Antitrust Litig.*, 739 F.3d at 284.

Defendants state that the Sixth Circuit Court of Appeals has established a number of critical principles regarding antitrust standing and injury, and has dismissed many antitrust cases that fail to adequately allege these prerequisites (Dkt 119 at PageID.890). Defendants argue that in this regard, Lease America's allegations of antitrust injury suffer from two fatal flaws: Lease America has not adequately alleged that an antitrust violation was a "necessary predicate" to its injury, and it has not adequately alleged harm to *competition* as opposed to harm in its individual capacity as a *competitor* in the marketplace. The Court is not persuaded that this action is subject to dismissal on either ground under Rule 12(b)(6).

1. Necessary Predicate

Defendants argue that the Sixth Circuit requires an antitrust action plaintiff to establish the alleged antitrust violation was the "necessary predicate" of the injury, which Plaintiff here has failed to show. Defendants assert that the FAC instead establishes that AMI's exercise of its lawful right—termination of its contract with Lease America—was the actual and direct cause of Lease America's alleged injuries. Defendants contend that it is immaterial that the FAC links AMI's exercise of that right to an alleged antitrust violation because Lease America has not alleged that that violation was the "necessary predicate" of its injury.

Plaintiff acknowledges that in *In re Cardizem CD Antitrust Litigation*, 332 F.3d at 911-14, the court reviewed a line of Sixth Circuit precedent that explicates the antitrust injury requirement (Pl's. Resp., Dkt 120 at PageID.970). "[I]n order to survive a motion to dismiss for failure to allege antitrust injury, a plaintiff must allege that the antitrust violation is *either* the 'necessary predicate'

7

for its injury *or* the only means by which the defendant could have caused its injury." *In re Cardizem CD Antitrust Litig.*, 332 F.3d at 900 (citing *Hodges v. WSM, Inc.*, 26 F.3d 36, 39 (6th Cir. 1994) and *Valley Prods. Co. v. Landmark*, 128 F.3d 398, 404 (6th Cir. 1997)).

In *In re Cardizem CD Antitrust Litigation*, the Sixth Circuit noted: "we have only dismissed a case for failure to allege that an antitrust violation is the 'necessary predicate' for the plaintiff's injury where it has been apparent from the face of the complaint that actual and unequivocally legal action by the defendant would have caused plaintiff's injury, even if there had been no antitrust violation." *In re Cardizem CD Antitrust Litig.*, 332 F.3d at 914. Accordingly, dismissal is appropriate only if the plaintiff's allegations, taken as true and construed in the plaintiff's favor, somehow precluded the possibility that the injury flowed from the anticompetitive effects of the alleged antitrust violation. *See id.* at 911. No such conclusion can be drawn from the allegations in this case.

Here, as Plaintiff argues, no "legal action" is apparent on the face of the complaint, or even from the extrinsic evidence, that undercuts Lease America's claim of antitrust injury. The fact that AMI asserts that it would have or could have terminated Lease America's Agreement even absent the alleged collusion with the AMOA is not sufficient for dismissal because this issue implicates factual issues beyond the ambit of a Rule 12(b)(6) dismissal. *See In re Cardizem CD Antitrust Litig.*, 332 F.3d at 911, 915 (proof of allegations on the face of this complaint and reasonable inferences therefrom could persuade a trier of fact that the antitrust injury flowed from the alleged antitrust action). Plaintiff's complaint is not fatally flawed with respect to showing the antitrust violation was the "necessary predicate" of Plaintiff's injury.

2. Harm to Competition

Defendants argue that the FAC fails to adequately allege harm to competition, as opposed to harm to Lease America individually. Absent "concrete allegations of harm" to competition, an antitrust complaint must be dismissed. *Indeck Energy Servs., Inc. v. Consumers Energy Co.*, 250 F.3d 972, 979 (6th Cir. 2000); *see also Tennessean Truckstop, Inc. v. NTS, Inc.*, 875 F.2d 86, 90-91 (6th Cir. 1989) (failure to allege an "injury" "of the type the antitrust laws were intended to prevent" requires dismissal). "It is not enough to simply allege that an individual competitor suffered adverse effects from the defendants' contract or conspiracy." *In re Se. Milk Antitrust Litig.*, 739 F.3d at 284.

> "[B]ecause the purpose of the antitrust laws is to protect competition rather than competitors, a plaintiff must allege injury, not only to himself, but to a relevant market. Thus, failure to allege an anti-competitive impact on a relevant market amounts to a failure to allege an antitrust injury." *Brown Shoe Co. v. U.S.*, 370 U.S. 294, 320 [] (1962). This requirement means that "one competitor may not use the antitrust laws to sue a rival merely for vigorous or intensified competition." *NicSand, Inc.* [*v. 3M Co.*, 507 F.3d 442, 450 (6th Cir. 2007]. Specifically, "a plaintiff must put forth factual allegations plausibly suggesting that there has been an adverse effect on prices, output, or quality of good in the relevant market as a result of the challenged actions." *Guinn v. Mount Carmel Health*, 2012 WL 628519 at *4, No. 2:09cv226 [] (S.D. Ohio Feb. 27, 2012).

*Dodge Data & Analytics LLC v. iSqFt, Inc.*, ___ F. Supp. 3d. ___, 2016 WL 1702326, at *3 (S.D. Ohio, 2016) (footnote omitted).

In the circumstances presented in this case, the Court finds no shortcoming that dooms Plaintiff's complaint. The FAC alleges as a foundation, attributes unique to the jukebox market (FAC ¶¶ 12-16 at PageID.414-416) and that Lease America's business model, via its agreement with Rowe/AMI, challenged the traditional market/operator business model (*id.* ¶¶ 17-18 at PageID.416-417). These allegations include that there are two large, significant manufacturers of jukeboxes, one of which was Rowe, which held approximately 70 percent of the U.S. jukebox market, with

9

approximately 230,000 jukeboxes in operation (*id.* ¶ 13 at PageID.415).  The FAC also contains allegations of instances of the mainstream industry's/AMOA's opposition to the direct selling of jukeboxes and condemnation of any practice that would threaten the operator community (e.g., *id.* ¶¶ 16, 19, 24 at PageID.415, 417-419).  Considered in this context, the allegations of harm, and all reasonable inferences therfrom, sufficiently allege harm to competition as opposed to harm to only Lease America as a competitor.

Plaintiff has plausibly alleged a reduction in price competition in that price competition in both the market for purchasing jukeboxes and market for playing music was harmed because "Defendants were relieved of the competitive pressure created by Lease America's direct-selling business model" (FAC ¶ 33(a) at PageID.421).  Lease America alleges its method was "more favorable to consumers than the traditional method" (FAC ¶ 1), and would "reduce fees paid by venues" (*id.* ¶ 17).  Competitors would have to price compete with Lease America or innovate to compensate for having a less favorable and more expensive business method (*id.* ¶ 33(a)).  Since Lease America's business method allowed a venue owner to "dictate the price a patron paid per song," it stimulated price competition between venues that would ultimately "reduce fees paid by venues and end users" (*id.* ¶ 17).  The alleged elimination of Lease's America's business method thus plausibly resulted in harm not just to Lease America itself but also to market competition generally.

As Plaintiff additionally points out, the FAC contains plausible allegations of a reduction in output and consumer choice and the suppression of innovation, which are recognized competitive harm.  *See Nat'l Collegiate Athletic Ass'n v. Bd. of Regents of Univ. of Okla.*, 468 U.S. 85, 107-08 (1984) ("A restraint that has the effect of reducing the importance of consumer preference in setting

price and output is not consistent with this fundamental goal of antitrust law. Restrictions on price and output are the paradigmatic examples of restraints of trade that the Sherman Act was intended to prohibit.") (footnote omitted)). *See Atari Games Corp. v. Nintendo of Am., Inc.*, 897 F.2d 1572, 1576 (Fed. Cir. 1990) ("encouraging innovation" is one of the purposes of the antitrust laws).

For example, Lease America alleged that after "Defendants' boycott was implemented, Lease America has received thousands of inquiries from interested consumers across the country to buy jukeboxes directly from Lease America," but consumers were unable to purchase jukeboxes from Lease America, resulting in a reduction in total output, and limited consumer choice (FAC ¶ 33(b), (e) at PageID.421-422). The Rowe/AMI elimination of Lease America's jukeboxes from the market "had the effect of relieving Defendants of the competitive pressure of responding to innovations, with the result that innovation in the way digital jukeboxes can be obtained and operated by consumers has been, and will continue to be, suppressed …" (*id*. at ¶ 33(e)). "[C]onsumers were unable to purchase jukeboxes from Lease America and were required to stick with the outdated and inefficient status quo" (*id.*).

These, as well as specific allegations of a number of other anticompetitive effects of Defendants' actions (*id.* ¶ 33(a)-(e)), suffice to withstand Defendants' motion to dismiss.

### 3. Antitrust Standing

Defendants argue Plaintiff has not adequately established that it has proper antitrust standing under Sixth Circuit authority. "[A]ntitrust standing is a threshold, pleading-stage inquiry and when a complaint by its terms fails to establish this requirement we must dismiss it as a matter of law …." *NicSand*, 507 F.3d at 450. The purpose of the inquiry is to ensure that recovery is confined to cases

where consumers will receive the benefits of a competitive market, consistent with congressional intent. *Axis, S.p.A. v. Micafil, Inc.*, 870 F.2d 1105, 1111 (6th Cir. 1989); *NicSand*, 507 F.3d at 449.

To establish antitrust standing, a district court must consider the following factors:

> (1) the causal connection between the antitrust violation and harm to the plaintiff and whether that harm was intended to be caused; (2) the nature of the plaintiff's alleged injury including the status of the plaintiff as consumer or competitor in the relevant market; (3) the directness or indirectness of the injury, and the related inquiry of whether the damages are speculative; (4) the potential for duplicative recovery or complex apportionment of damages; and (5) the existence of more direct victims of the alleged antitrust violation.

*Southaven Land Co. v. Malone & Hyde, Inc.*, 715 F.2d 1079, 1085 (6th Cir. 1983) (citing *Associated Gen. Contractors of Cal., Inc. v. Cal. State Council of Carpenters*, 459 U.S. 519, 537-45 (1983)); *see also Caruana v. Gen. Motors Corp.*, 204 F. App'x 511, 515-16 (6th Cir. 2006). "All five factors must be balanced, however, with no one factor being determinative." *Indeck*, 250 F.3d at 976.

Defendants argue that the FAC fails to satisfy these factors for many of same reasons it fails to adequately plead antitrust injury. Having found Defendants' arguments with respect to antitrust injury unpersuasive, the Court likewise finds no deficiency with respect to antitrust standing. Taking the allegations of the FAC in their entirety, the Court concludes that Plaintiff's pleadings support the requisite standing factors. Plaintiff's allegations set forth in detail the nature of the jukebox market, Lease America's non-traditional business model, the successful efforts to eliminate its operation, and resulting anticompetitive effects. These allegations, along with those discussed above, establish the causal connection between the antitrust violation and the harm to Plaintiff, and that the harm was intended; and Plaintiff's status in the relevant market and the nature of Plaintiff's alleged injury. The fact that the harm extends to venues or patrons of those venues does not make them more direct victims or more proper plaintiffs than Lease America on the facts presented. There

is no potential for duplicative recovery or complex apportionment of damages, and no basis to conclude that damages are speculative. The directness or indirectness of the injury does not weigh significantly either way in the circumstances presented. Viewing the pleadings and all reasonable inferences in favor of Plaintiff, the factors support a finding of antitrust standing.

### B. Antitrust Violation under the *Per Se* Rule or the Rule of Reason

Defendants' remaining basis for dismissal is that the FAC fails to adequately allege an antitrust violation under either the *per se* rule or the rule of reason. The "*per se* rule" and the rule of reason" are different means of showing that a restraint is unreasonable. *In re Se. Milk Antitrust Litig.*, 739 F.3d at 270. While Defendants' argument that this case may not be sustained under the *per se* rule has merit, the Court disagrees that it is subject to dismissal as well under the rule of reason.

Section 1 of the Sherman Act targets agreements that unreasonably restrain trade. *Care Heating & Cooling, Inc. v. Am. Standard, Inc.*, 427 F.3d 1008, 1012 (6th Cir. 2005); *Delta Turner, Ltd. v. Grand Rapids—Kent Cnty. Convention/Arena Auth.*, 600 F. Supp. 2d 920, 934 (W.D. Mich. 2009). "Two analytical approaches have developed to determine whether a defendant's conduct unreasonably restrains trade: the *per se* rule and the rule of reason." *Care Heating & Cooling*, 427 F.3d at 1012. "The *per se* rule identifies certain practices that completely lack redeeming competitive rationales." *Id.* "If a court determines that a practice is illegal *per se*, further examination of the practice's impact on the market or the procompetitive justifications for the practice is unnecessary for finding a violation of antitrust law." *Id.* "The rule of reason, however, instructs a court to examine both the history of the restraint and the restraint's effect on competition," under a burden-shifting framework. *Id.*

"[T]he *per se* rule should be applied only in 'clear cut cases' of trade restraints that are so unreasonably anticompetitive that they present straightforward questions for reviewing courts." *Care Heating & Cooling*, 427 F.3d at 1012. "The Supreme Court has identified certain types of restraints as subject to the *per se* rule"; "classic examples are naked, horizontal restraints pertaining to prices or territories." *In re Cardizem CD Antitrust Litig.*, 332 F.3d at 907, citing, e.g., *United States v. Topco Assocs.*, 405 U.S. 596, 608 (1972) "("One of the classic examples of a *per se* violation of § 1 is an agreement between competitors at the same level of the market structure to allocate territories in order to minimize competition. Such concerted action is usually termed a 'horizontal' restraint, in contradistinction to combinations of persons at different levels of the market structure, e.g., manufacturers and distributors, which are termed 'vertical' restraints. This Court has reiterated time and time again that horizontal territorial limitations ... are naked restraints of trade with no purpose except stifling of competition. Such limitations are *per se* violations of the Sherman Act." (internal citations omitted))."

Defendants argue that this case alleges an agreement that is vertical in nature because the two main defendants are AMI, a manufacturer, and the AMOA, a trade association whose members may include AMI's customers. Defendants thus argue that this case can only be judged under the rule of reason.

Plaintiff argues to the contrary that because the AMOA is a trade association comprised of a group of competitors, any agreement between them is horizontal and the presence of a vertical actor (AMI) does not alter the agreement's horizontal nature. *See Denny's Marina, Inc. v. Renfro Prods., Inc.*, 8 F.3d 1217, 1220 (7th Cir. 1993) ("The conspiracy in this case was horizontal because it was 'the product of a horizontal agreement.' It consisted of Denny's competitors and their

association.  That the conspiracy was joined by the operators of the Fairgrounds boat shows does not transform it into a vertical agreement.") (citation omitted); *see also Com-Tel, Inc. v. DuKane, Corp.*, 669 F.2d 404, 409 (6th Cir. 1982) ("[A]lthough the coercive pressure in this situation was applied vertically, we conclude that the stifling of competition in this instance was predominantly horizontal, warranting application of the per se rule of illegality as a group boycott.").

In reply, Defendants assert that although Plaintiff argues that *Denny's Marina* supports its contention that the FAC alleges a horizontal agreement joined by a vertical competitor, *In re Southeastern Milk Antitrust Litigation*, 801 F. Supp. 2d 705, 720-21 (E.D. Tenn. 2011), is a more persuasive case.  Defendants note that after the plaintiffs in *In re Southeastern Milk Antitrust Litigation* alleged that vertical entities "simply joined in [a] horizontal agreement" among the plaintiff's competitors, the court concluded that (1) the alleged agreements challenged by the plaintiffs were vertical in nature, and (2) even if the agreements were horizontal, they did not involve the kind of "naked restraint" subject to *per se* analysis.  *Id.* at 720.  Defendants thus argue that this Court should preclude Plaintiff from proceeding under a *per se* theory of antitrust liability.

"The *per se* rule should only be used when the restraint has 'such predictable and pernicious anticompetitive effect,' that there is 'limited potential for procompetitive benefit.'"  *In re Se. Milk Antitrust Litig.*, 739 F.3d at 271 (quoting *In re Cardizem CD Antitrust Litig.*, 332 F.3d at 907) (citation omitted).  "Applying this standard, then, should be done reluctantly and infrequently, informed by other courts' review of the same type of restraint, and only when the rule of reason would likely justify the same result."  *Id.* (citing *Leegin Creative Leather Prods., Inc. v. PSKS, Inc.*, 551 U.S. 877, 886 (2007) (citations omitted)).  "Unless the restraint falls squarely into a *per se* category, the rule of reason should be used instead."  *Id.*

While the Court acknowledges that Plaintiff could conceivably establish a basis for applying the *per se* rule under the circumstances presented, such justification is not clear on the face of the complaint or the limited record before the Court.  This case does not present the type of classic restraint deemed unlawful *per se* because "they 'have such predictable and pernicious anticompetitive effect, and such limited potential for procompetitive benefit.'" *In re Cardizem CD Antitrust Litig.*, 332 F.3d at 906.  Accordingly, the well-established presumption in favor of the rule of reason analysis is appropriately applied.

To establish a prima facie case under the rule of reason, a plaintiff must show five elements: "(1) a conspiracy (2) that produced anticompetitive effects; (3) that the scheme 'affected relevant product and geographic markets'; (4) that the conspiracy's goal and related conduct was illegal; (5) and that the restraint was the proximate cause of the plaintiff's antitrust injury." *In re Se. Milk Antitrust Litig.*, 739 F.3d at 272 (citations omitted); *see also Total Benefits Planning Agency, Inc. v. Anthem Blue Cross & Blue Shield*, 552 F.3d 430, 436 (6th Cir. 2008).

The Court finds Plaintiff's allegations in the FAC sufficient to proceed under the rule of reason.  Contrary to Defendants' assertions, the FAC does not fail to state a plausible claim for relief; it contains detailed allegations of the underlying agreement/conspiracy (element 1), anticompetitive effects (element 2) in the relevant product and geographic markets (element 3), and illegal conduct (element 4), that was the proximate cause of Plaintiff's injury (element 5) (*see* Dkt 119 at PageID.905-906).

The Court has in large part addressed the allegations supporting these elements in resolving the issues above.  The complaint contains specific allegations of concerted action, identifying the parties, their roles in the jukebox market, the operation of the digital jukebox industry, and

Defendants' actions of conspiring to boycott Lease America's method of operation in or around 2009 after Lease America announced its business model at a trade show in Las Vegas (FAC ¶¶ 21-23). Plaintiff alleges that at a meeting in early 2009, AMOA members decided that they would boycott Rowe if it continued allowing Lease America to sell direct and that a participant at the meeting relayed this information to Pietrewicz, Lease America's owner (*id.* ¶ 21). In late February to early March 2009, "the AMOA approached Rowe and threatened that its operator members would no longer use Rowe jukeboxes if Rowe continued to allow Lease America to sell its jukeboxes direct. Unwilling to lose an enormous share of its customer base, Rowe agreed with the AMOA and its members to boycott Lease America, and on March 10, 2009, Rowe terminated Lease America's agreement …." (*id.* ¶ 22).

The FAC alleges that as a result of Defendants' actions, Lease America's jukeboxes were turned off from a Rowe central server, and neither Lease America nor the venue's owners were able to access the content of the jukeboxes, rendering them useless (*id.* ¶ 23). "Lease America could not practicably turn to the only other significant jukebox manufacturer, Touch Tunes, as a substitute or alternative to Rowe because (1) no other jukebox manufacturer could make Lease America's Rowe hardware (digital jukeboxes) work with their respective platforms and (2) no other manufacturer, including Touch Tunes, would, after the boycott threat, deal with Lease America" (*id.*). The FAC in a number of paragraphs relates the nature of the jukebox industry and Defendants' market power in the relevant market. The FAC alleges that Defendants' conduct was illegal (*id.* ¶¶ 30-31), and that the described acts produced antitrust injury (*id.* ¶¶ 1, 13, 17, 22, 26, 33) and anticompetitive and injurious effects, particularly by reducing output, consumer choice and access, market innovation, and price competition (*id.* ¶ 33). Further, Lease America was driven out of business and sustained

a loss of net profits of slightly more than $5,000,000, and the loss of a going concern preliminarily calculated at approximately $10,000,000 (*id.* ¶¶ 34).

On a Rule 12(b)(6) motion, the Court must construe the complaint in the light most favorable to the plaintiff and accept all well-pleaded factual allegations in the complaint as true. *See Thompson*, 773 F.3d at 750. The ultimate question is whether the complaint presents enough facts to state a claim that is plausible. *Twombly*, 550 U.S. at 570. Here, the FAC's thirty-nine paragraphs describing the underlying circumstances and acts, along with the five specific subparagraphs speaking to the resulting anticompetitive effects and injury, are adequate to withstand dismissal under Rule 12(b)(6).

## IV. Conclusion

While Defendants' arguments may prove to have merit at a subsequent stage of these proceedings, the Court is persuaded that they do not warrant dismissal of Plaintiff's antitrust claim based on pleadings alone. Having fully considered the parties' arguments and relevant legal authority, the Court concludes that Defendants' motion to dismiss is properly denied. An Order will be entered consistent with this Opinion.

Dated: September 26, 2016                         /s/ Janet T. Neff
                                                                          JANET T. NEFF
                                                                          United States District Judge